**2024 UT App 60**

# THE UTAH COURT OF APPEALS

S AND W HUNTING RANCH, LLC,
Appellee,

*v.*

DEE LYNN FAUTIN, WADE FAUTIN, CORY FAUTIN,
AND MOO DEE RANCH, LLC,
Appellants.

Opinion
No. 20220432-CA
Filed April 25, 2024

Sixth District Court, Junction Department
The Honorable Brody Keisel
No. 160600008

Lewis P. Reece, Jeffrey R. Miles, and Devon J.
Herrmann, Attorneys for Appellants

Ben W. Lieberman, Attorney for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1     Deep in the Tushar Mountains, within Fish Lake National Forest, a dirt road meanders in a southwesterly direction across property that S and W Hunting Ranch, LLC (S&W) purchased in 2016. Not long after the purchase, S&W shut off access to the property, including to a small group of folks who claimed to have been using the dirt road for decades—a father, Dee Lynn Fautin; his two sons, Wade Fautin and Cory Fautin; and their entity, Moo Dee Ranch, LLC (collectively, Fautins; individually by given name). S&W filed an action to quiet title and enforce its right of exclusion. The Fautins countersued on a number of theories, including that the road had become a public road pursuant to

Utah's dedication statute (Dedication Statute), *see* Utah Code § 72-5-104, or, alternatively, that the Fautins had obtained a prescriptive easement to use the road. After a multi-day bench trial, the district court rejected the Fautins' claims and quieted title in S&W's favor. The Fautins appeal, raising several claims, all of which we reject.

BACKGROUND

¶2　The Fautins' appeal raises multiple issues surrounding the interpretation of Utah law and the district court's application of the law to the established facts. In their appeal, the Fautins do not challenge any of the district court's factual findings as clearly erroneous. *See Ashby v. State*, 2023 UT 19, ¶ 77, 535 P.3d 828 ("We defer to the factual findings of the [district] court unless the findings are clearly erroneous." (cleaned up)). Accordingly, what follows is a factual recitation taken, as relevant for the purposes of the appeal, from the district court's findings. The statements in quotes are therefore quoting the district court's findings.

¶3　This case involves property (the Property) that S&W purchased via a special warranty deed in June 2016. The Property consists of a series of patented mining claims in Piute County, Utah, just west of the town of Marysvale.[1] These mining claims date back over a century; most of them were established in 1915, with one going back to 1889. Prior to S&W's purchase of the

---

1. "A patented mining claim is one in which the government has passed its title to the claimant, giving [the claimant] exclusive title to the locatable minerals, and, in most cases, the surface and all resources." *Swanson v. Babbitt*, 3 F.3d 1348, 1350 (9th Cir. 1993). "A mining claimant receives a 'patent,' that is, an official document issued by the United States attesting that fee title to the land is in the private owner. A patented mining claim is a property right in the full sense." *Reoforce, Inc. v. United States*, 853 F.3d 1249, 1256 (Fed. Cir. 2017) (cleaned up).

Property, it belonged to the Magnus family from 1967 to 2016, which had acquired the Property through a United States marshal's deed that arose from litigation between a Magnus family member and Lucy DeLuke, along with other parties.

¶4 Shortly after the purchase, S&W filed a complaint seeking a declaratory judgment to quiet title to the Property, including a segment of a road (the Road) that passes through the Property. The Fautins filed a counterclaim seeking a declaratory judgment that all members of the public, including themselves, enjoyed the right to use the Road under the Dedication Statute. *See* Utah Code § 72-5-104(2) ("A highway is dedicated and abandoned to the use of the public when it has been continuously used as a public thoroughfare for a period of 10 years."). In addition, and in the alternative, the Fautins sought declaratory judgment that they had a prescriptive easement to use the Road, even if the general public did not.

¶5 Central to the present dispute was the condition, location, and historical use of the Road, which was constructed to link the now-abandoned mining operations and which is currently used to access the Property and surrounding area. It meanders through the Property, beginning in the northeast portion and traversing it in a generally westerly direction. In several locations, the Road exits and then re-enters the Property. "Significant testimony was presented at trial attempting to establish the origin and history of the . . . Road," including "various surveys and aerial photographs with competing expert testimony" and witness testimony, which we summarize here from the district court's findings of fact.

*Historical Evidence*

¶6 A 1973 aerial photograph provided the "clearest representation of the . . . Road as it presently exists." The court described the Road as beginning in the upper right corner of the Property as depicted in the photograph, having a number of switchbacks, and looping back up into the tree line of the

Property. With this present route of the Road established, the court received evidence of the Road as it had existed over the years.

¶7    An 1897 map of the area showed several mines with "a line that [continued] in a general eastward direction that could represent a road or trail."

¶8    A 1910 map depicted the Property, surrounding areas, and a trail purported to be part of the Road. Along with the map itself, competing expert witness testimony was offered about the trail as depicted therein. The map showed various mining claims on the Property and featured a dotted line labeled "Copper Belt Trail." However, the dotted line was "quite difficult to follow," and "annotations on the map [made] it somewhat unclear if the dots" were "meant to be a continuation of the trail or another unidentified or unexplained mark on the map." The 1910 map did "not show specific characteristics of the . . . Road in its present form, such as the switchbacks," a "sharp curvature," and "what happens to the [Road] outside of the Property."

¶9    A 1937 map showed "a trail existing in the area of the Property." But the labeling on the map was unclear about the identification of the trail in question.

¶10    A 1943 photograph, taken at a slightly different angle, was of lower quality and more pixelated than the other photographs in evidence. While this photograph showed "white lines, presumably a road or trail," other elements of the Road, such as the switchbacks, were not clearly evident in it.

¶11    A 1953 photograph shows the Road "in substantially the same location" as depicted in the 1973 photograph and as it currently exists.

¶12    The Fautins' expert stated that the 1910 map depicted the "general location" of the Road and opined that "other than

improvements such as switchbacks," the map showed the "same road" that had historically been used to access the mining camps. The Fautins' expert also testified the improvements to the Road were "likely" made to address safety and grade concerns. S&W's expert noted that there were "several distortions" on the 1910 map attributable to "printing or copying errors."

¶13 In addition to the maps, photographs, and expert testimony, two fact witnesses testified about the history of the Road. Witness 1, who was born in 1934, recollected that the Road was built between 1946 and 1948, but he clarified that he was uncertain if the Road was actually built during those years or if it was just improved during that time.[2] Witness 2—a former archeologist with the National Forest Service—provided testimony about the use of the Property during the mining days in the late nineteenth century, but he "did not provide any testimony about the existence of the . . . Road prior to 1900 or otherwise."

¶14 Considering this historical evidence, the district court concluded that "[g]iven the various maps and photographs received into evidence, it would be nearly impossible for a fact finder to state that the . . . Road has been entirely unchanged over the last 150 years." The court compared the current representation of the Road in the 1973 photograph to earlier sources and stated that the 1897 map did not provide "clear and convincing evidence showing that the . . . Road existed in a form that is substantially unchanged from its present condition and location." The court further concluded that while the trail depicted in the 1910 map crossed the Property in a "similar direction" as the Road, the court "would be required to make speculations" that the trail depicted in the 1910 map followed "the same course as the . . . Road presently follows." The court also found that while the Fautins'

---

2. Unless indicated otherwise, the witnesses, whom we identify by numbers, were local residents.

expert "provided a thoughtful approach to what he observed" on the 1910 map, his "testimony often required the [c]ourt to infer or use supposition to reach his same conclusions." Thus, the court determined that it could not "find by clear and convincing evidence that the . . . Road existed in 1910 in a location and condition that is substantially unchanged from its present form." Furthermore, the court determined that the 1937 map was not of any more help than the 1910 map in that it required the court "to speculate" to find that the Road existed in 1937 "in a location and condition that is substantially unchanged from its present form." Accordingly, the court stated that the 1937 map did "not meet the clear and convincing evidence standard." Finally, the court found that the 1943 photograph, while it provided "sufficient landmarks" to allow one to "speculate" that the Road "existed in a similar configuration and location as it does today," did "not rise to the clear and convincing standard."

*The Road's Use and Access*

1.     *Gates*

¶15     Testimony and photographic evidence were also offered as proof that two gates limited access to the Road. These two gates are located on either side of an abandoned mine that marks the eastern edge of the Property.

¶16     The first gate, located on National Forest Service land north of the Property, is a chain-link fence featuring three prominent signs warning against trespassing, stating that trespassers would be prosecuted and that security cameras were in use. Dee Lynn Fautin testified that the Fautins put the signs on the gate. He explained that the gate had been there since the 1950s or 1960s and was built by Lucy DeLuke's employees. Dee Lynn specified that the gate was sometimes open because the locks were broken but had generally been locked since first installed, that it had been open for "two or three years" in the 1970s, and that it was torn down around 2012 and then repaired by his nephew.

¶17     Wade Fautin testified that the first gate was usually locked and that he would relock it when he used it. He also testified that the Fautins repaired the gate when it was damaged "because they wanted to keep the public off" the Road and to protect their "belongings beyond the gate." He further stated that the Fautins "took control over and spearheaded the maintenance" of the gate in the mid 1980s.

¶18     Cory Fautin testified that he had helped reinforce the first gate, added a barrier to the side, and posted the signs on it. He said the gate was usually locked and that its purpose was "to exclude the public from using the . . . Road and also to protect [the Fautins'] belongings."

¶19     Witness 3 testified that the "gate was always locked when he visited the Property for several years in the 1980s." And Witness 4 testified that there were "a few years in the 1980s or 1990s . . . when no gate or cable blocked access to the Property."

¶20     The second gate, located to the south of the first gate but on the Property, was connected to a post on one side and cabled to a tree on the other. It too featured warning signs stating "no trespassing," "private property," and that security cameras were in use. Dee Lynn said that he, his sons, and an acquaintance installed this gate in the 1980s or 1990s; that it was "consistently locked"; and that the Fautins replaced damaged or broken locks. Cory testified that the Fautins installed the second gate, noting that they had done so "without giving notice to the Forest Service, [Piute] County, or the property owners." He said the purpose of the second gate was to prevent his cows from wandering.

*2.      Locks*

¶21     In addition to the presence of the two gates, the court heard testimony from several witnesses "about the locks on the gates and the possession of keys for these locks."

¶22 "Dee Lynn testified that he and his family would often put new locks" on the two gates "when the old locks were broken off"; that he would exchange the lock keys with DeLuke from the early 1970s on; that DeLuke's friends would go to her for keys; and that he did not know if DeLuke "acted on her own behalf or on behalf of Rollo Peterson," an individual Dee Lynn "assumed had a relationship with the Property owner."[3] And after DeLuke died, Dee Lynn exchanged keys with Peterson.

¶23 Wade testified that he borrowed keys for the locks from his father until he obtained his own keys. In addition, Wade said that there were "hidden keys . . . near the gates . . . that the Fautins, but not the public at large, knew about." He also said that the Fautins would give DeLuke a new key whenever they replaced a lock on the gate.

¶24 Witness 1, Witness 4, and Witness 5 testified that whenever they used the Road, they would get a key from Dee Lynn, DeLuke, or Peterson. In particular, Witness 5 testified that the "person who possessed the key decided who else used the key, and that many people who could not obtain keys 'were hostile towards' those who had access to a key," with his impression being that "the general reputation in Marysvale was that a person needed permission to go on the . . . Road."

*3.     Use of the Road*

¶25 Several witnesses testified about their use of the Road over the years.

¶26 Dee Lynn said that he first used the Road in 1949 when he was about eight years old and that he "continuously used" the Road "as often as he found convenient or necessary" until S&W

---

3. In his deposition, Dee Lynn indicated that Peterson was an individual "who sort of took on [DeLuke's] role as manager" of the Property.

purchased the Property and told him he could not use it. He testified that "members of the public" did "not freely" travel "up and down the road" after the gate was installed. However, he "contradicted this testimony by stating that from 2006 to 2016, members of the public traveled" the Road by going around the first gate. He recalled "sometimes" seeing members of the public on the Property. Dee Lynn further stated that he "did not believe" the Road was private "because he and his family used it," but he also admitted that DeLuke and Peterson gave him permission to use the Road. In a deposition, Dee Lynn also indicated that even though "he wasn't entirely sure who owned what," he believed that DeLuke was "acting as owner or manager" of the Property and that when "people were allowed to travel on the . . . Road, they received permission" from DeLuke.

¶27 Witness 4 and Witness 6 testified much the same about needing to obtain keys from DeLuke. And evidence was presented that DeLuke signed her name as "agent" for work done on the Road at the request of the Magnuses.

¶28 Wade remembered visiting the Road in the late 1970s when he was "very young." He testified that he "continuously" used the Road "as often as he found convenient or necessary" until S&W purchased the Property and that "[n]o one except [S&W] told him he could not use the . . . Road." He also testified that he would "go around" the first gate when it was locked. He said he was "uncertain" about DeLuke's "role in the ownership or management of the Property but he understood that she had hard feelings towards the Magnuses."

¶29 Cory testified that he first used the Road in the mid 1970s and had continued to do so "at least annually." He recalled that he "continuously used" the Road "as often as he found convenient or necessary" until S&W purchased the Property and told him to stop. He further stated that "[n]o one except [S&W] told him he could not use the . . . Road." He also testified that the locked gates

on the Road afforded him a protected place he could go as a teenager "to avoid detection while drinking beer." He said he "never believed" the Road was private, but he did not "know who owned" it and never gave it much thought. He did say that DeLuke "claimed it was 'her mountain,' but he did not investigate her actual ownership." Cory testified that he wanted to "keep others off" the Road "so that his belongings behind the gate wouldn't disappear." Cory also testified that he at times saw other people on the Property engaged in hunting, camping, photography, stargazing, and cutting down Christmas trees.

¶30    Witness 3 testified that beginning in 1981, he and family members used the Road annually for four years to access the Property for hunting. This witness stated that "he and members of the hunting party who could use the . . . Road and hunt behind the locked gates 'felt like kings.'" When Witness 3 returned to hunt in 1998, he accessed the Property using "alternate trails" rather than the Road. He noted that other hunters used these trails rather than the Road to get to the area around the Property.

¶31    Witness 1 testified to traveling on the Road several times in 1952, 1958, and 1961. This witness testified that he would ask Peterson for permission to hunt on the Property and that "it was common knowledge that you needed to ask . . . Peterson to access the Property through the gate," a practice he believed was intended to limit the number of hunters who could access the Property.

¶32    Witness 5 testified that the use of the Road "depended on who had the key," which created hard feeling about access to the Road and the Property in the community. And Witness 7 testified that visits to the Property using the Road were limited due to a lack of "permission to do so."

¶33    In weighing this testimony, the district court concluded that DeLuke continued to work as an agent for the Magnuses after they had acquired the Property, that those wishing to use the

Property would go to DeLuke "to get keys to access" the Road, and that the "general reputation was that you needed . . . DeLuke's permission" to use the Road.

*The District Court's Decision*

¶34 The district court determined that the Fautins' counterclaims for a dedicated road or a prescriptive easement failed.[4] As a result, the district court quieted title in S&W.

*1.    Dedication Claim*

¶35    Regarding their counterclaim that the Road was a public thoroughfare dedicated to public use pursuant to the Dedication Statute, the court acknowledged that "the Fautins, who are a subset of the general public, continuously traveled" the Road, along with "other members of the general public when invited by the Fautins or" when DeLuke granted them permission to use it. The court also acknowledged that "sometimes . . . uninvited members of the public" used the Property for various activities. But the court nevertheless found that "DeLuke and the Fautins took extensive measures to prevent the general public from traveling" on the Road, most notably "constructing, maintaining, and locking the gates" to block the Road. And the court determined that the Fautins "fastidiously kept the . . . Road behind well-maintained, locked gates for over 50 years" and that they "took these actions for the express purpose of keeping the general public (outside of their approved circle of friends and family) from using" the Road.

¶36    The court rejected the suggestion that members of the public could freely circumvent the gates, most notably because

---

4. The district court also determined that the Fautins' other counterclaims, which are unnecessary to discuss because they are not challenged on appeal, failed.

the Fautins continued in their efforts to maintain the gates and repair the locks:

> At no point did [the Fautins] see enough members of the public using the . . . Road that they decided these efforts were futile and should be abandoned—that the gates should be removed or that keys should be freely distributed. Now, faced with the prospect of losing their own ability to use the . . . Road, [the Fautins] imply that the 50 years of effort spent keeping the . . . Road exclusive was futile because the [Road] was open to any member of the general public who desired to use it as frequently as that member found necessary or convenient. This suggestion simply does not align with the time and effort that [the Fautins] spent asking for keys from . . . DeLuke, exchanging keys among themselves and friends, repairing gates, making sure to close gates behind them when using the . . . Road, and replacing locks. Nor does it square with testimony about the general reputation that you needed permission from . . . DeLuke to access the [Road] or [the Fautins'] expressed intent to keep members of the public from using the [Road].

¶37　Based on the testimony and evidence, the court concluded that while the Fautins, DeLuke, and "specific invitees continuously used the . . . Road as *members of the public* for at least the ten-year continuous period required" by the Dedication Statute, "these members of the public prevented *the public*, as interpreted by the case law applying the Dedication Statute, from accessing the . . . Road as frequently as they found necessary or convenient." (Emphasis in original.) Thus, the court determined the Fautins "did not meet their burden of proof to show . . . by clear and convincing evidence" that the Road had been dedicated to public use.

## 2. Prescriptive Easement Claim

¶38 Alternatively, the Fautins argued that they possessed a prescriptive easement in gross allowing them to use the Road.[5] But the district court concluded that Dee Lynn never had an "adverse mental state" when using the Road. Specifically, the court determined that even though Dee Lynn "testified that he did not really know who owned what," he also testified that DeLuke "allowed" the Fautins to use the Road. Thus, the court concluded that Dee Lynn's use of the Road "commenced" when DeLuke was "the owner and [Dee Lynn] was acting with actual or perceived permission." Moreover, Dee Lynn testified that he "knew" when he continued to use the Road that he had "Peterson's permission to use [it] whenever he wanted." Thus, "Dee Lynn did not present any testimony to suggest that he believed his use of the . . . Road was adverse."

¶39 Regarding Cory, the court noted that he "testified that he never believed that it was a private road," that he "didn't know who owned the road," and that he "never gave much thought as to who owned the road when using it." Moreover, Cory admitted that "nobody except [S&W] ever told him he could not use" the Road. Based on this testimony, the court concluded that Cory "never had an adverse mental state" when using the Road—

---

5. An easement in gross is an "easement benefiting a particular person and not a particular piece of land. The beneficiary need not, and [usually] does not, own any land adjoining the servient estate." *Easement*, Black's Law Dictionary (11th ed. 2019); *see also Dansie v. Hi Country Estates Homeowners Ass'n*, 2004 UT App 149, ¶ 11, 92 P.3d 162 ("An easement in gross is a mere personal interest in the real estate of another, and is not assignable or inheritable. It dies with the person, and it is so exclusively personal that the owner by right cannot take another person in company with him." (cleaned up)).

apparently because he could not really have an adverse mental state if he believed the Road was not private.

¶40    And as to Wade, the court observed that he believed he could use the Road "without permission" because the Fautins "had a cabin up there when he was a child." Wade also testified that "DeLuke knew he had been on the Property and that she never told him that he could not use" the Road. The only evidence that Wade presented suggesting that he believed his use of the Road to be adverse was "circumventing gates if they were locked and he did not have a key." But the court determined this practice was "more out of convenience than an act meant to controvert the Property owner."

¶41    Thus, having concluded that none of the Fautins' uses of the Road was "continuously adverse for the statutory period," the court determined that the prescriptive easement in gross counterclaim failed.

¶42    After determining that all the Fautins' counterclaims asserting their right to use the Road had failed, the district court ordered that S&W was entitled to a declaratory judgment of quiet title to the Road and the Property. The Fautins appeal.

ISSUES AND STANDARDS OF REVIEW

¶43    The Fautins first contend that the district court erred when it determined that there had been no public dedication of the Road. Relatedly, the Fautins claim the district court did not properly analyze evidence of public use of the Road prior to 1953. In challenging the district court's decision, the Fautins do "not dispute the court's factual findings." *State v. Clark*, 2014 UT App 56, ¶ 43, 322 P.3d 761, *cert. denied*, 333 P.3d 365 (Utah 2014). Accordingly, we review the court's ultimate determination about public dedication "as a matter of law and defer to the [district] court's fact-finding role by viewing the facts in the light most

favorable to the [district] court's decision to admit." *Id.* ¶ 43 (cleaned up); *see also Settlers Landing, LLC v. West Haven Special Service Dist.*, 2015 UT App 54, ¶ 13, 346 P.3d 684 (stating that where a district court supports its conclusions "with thorough factual findings" and an appellant "has failed to challenge these findings," we "defer to the court's findings"). Moreover, "whether the facts of a case satisfy the requirements of the Dedication Statute is a mixed question of fact and law that involves various and complex facts, evidentiary resolutions, and credibility determinations. An appellate court therefore reviews a [district] court's decision regarding whether a public highway has been established under the Dedication Statute for correctness but grants the court significant discretion in its application of the facts to the statute." *Utah County v. Butler*, 2008 UT 12, ¶ 9, 179 P.3d 775 (cleaned up).

¶44 The Fautins next assert that the court erred in determining that they did not have a prescriptive easement to use the Road. "In determining whether a prescriptive easement exists, a district court must make a number of factual findings regarding the duration and nature of the easement's use. The court must also correctly identify the legal standard governing the creation of a prescriptive easement." *SRB Inv. Co. v. Spencer*, 2020 UT 23, ¶ 6, 463 P.3d 654. Accordingly, "we review the district court's conclusions regarding the legal standard for correctness. And we review the court's factual findings, including how the court applied those findings to the correct legal standard, for an abuse of discretion." *Id.* (cleaned up).

ANALYSIS

I. Dedication

¶45 The Fautins argue that the district court erred in interpreting and applying the Dedication Statute when it determined there had been no public dedication of the Road. The

gist of their argument is that the Road was used by the Fautins, DeLuke, and a few invitees over many years and that this group of people was "the public," thus meeting the requirements of the Dedication Statute. The Fautins relatedly argue that the district court ignored clear and convincing evidence and so failed to properly analyze the historical route and use of the Road prior to 1953—an analysis that they argue would have supported historical public use of the Road. We address each contention in turn.

A.     Current Public Use of the Road

¶46     The Dedication Statute states that a "highway is dedicated and abandoned to the use of the public when it has been continuously used as a public thoroughfare for a period of 10 years." Utah Code § 72-5-104(2). And the "requirement of continuous use [of a highway, street, or road as a public thoroughfare] is satisfied if the use is as frequent as the public finds convenient or necessary and may be seasonal or follow some other pattern." *Id.* § 72-5-104(3).[6]

¶47     The Fautins assert that the district court "expressly found" that the public had used the Road for ten continuous years as required by the Dedication Statute. They base this argument on

---

6. Although the briefing at times touches on the issue of interruption of continuous use, *see* Utah Code § 72-5-104(4), this interruption—as the district court concluded—becomes relevant only once dedication as a public thoroughfare has been established. After all, there can be no interruption of use if use of a road as a public thoroughfare has not been established; in that situation, there's simply nothing to interrupt. And the Fautins bore the burden of proof on the issue of continuous use. *Id.* § 72-5-104(7)(a). Because we affirm the district court's decision on continuous use and dedication, we need not address the issue of interruption.

this snippet from the court's findings: "Ultimately, the [c]ourt finds that [the Fautins], . . . DeLuke, and specific invitees continuously used the . . . Road as *members of the public* for at least the ten-year continuous period required for dedication under the statute." (Emphasis in original.) And since this finding is unchallenged, the Fautins argue that the statutory requirements for dedication are satisfied.

¶48    However, this reading of the district court's findings is incomplete. After the sentence about the Fautins and their cohorts using the Road as "*members of the public,*" the court went on to say in the very next sentence, "However, these members of the public prevented *the public,* as interpreted by the case law applying the Dedication Statute, from accessing the . . . Road as frequently as they found necessary or convenient." (Emphasis in original.) Though the district court could have been more clear in its choice of words, it was in actuality drawing a contrast between "members of the public" and "the public," as evidenced not only by the obvious meaning of the two sentences but by the fact that the court italicized "members of the public" and "the public." This leads us to the inevitable conclusion that the court was not equating, but instead distinguishing, the two terms. Thus, it is clear that "members of the public" was not the same as "the public" in the court's ruling. In other words, the court was saying that if certain "members of the public" restrict access in order to frustrate the use of a road by the rest of "the public," then the conditions of the Dedication Statute are not satisfied. Read in context, the district court's ultimate determination was that the Road was not open to the general public.

¶49    Citing *AWINC Corp. v. Simonsen*, 2005 UT App 168, 112 P.3d 1228, the Fautins resist this interpretation of the district court's findings by asserting that the word "public" does not mean "a great many persons." *See id.* ¶ 11 ("The Utah Supreme Court has determined that continuous use of a road exists when the public, even though not consisting of a great many persons,

made a continuous and uninterrupted use not necessarily every day, but as often as they found it convenient or necessary." (cleaned up)).

¶50    We are not persuaded. While "the public" does not necessarily have to connote a great many persons, it also does not mean a small group of "members of the public" who actively try to prevent everyone outside their group from using the thoroughfare in question. Thus, that the court called the Fautin cohort "members of the public" is of no import in the context of the court's complete factual findings. After all, whenever anyone uses a private road, it could be said that "members of the public" are using the road. But the statute doesn't require use by just an exclusive club consisting of select "members of the public," rather it requires continuous use by "the public" of a road, highway, or street "as a public thoroughfare" for ten years. Utah Code § 72-5-104(2). And continuous use as a public thoroughfare means use "as frequent[ly] as the public finds convenient or necessary." *Id.* § 72-5-104(3). Thus, the use by "members of the public" is not the only element of the statute. It also requires "the public" to have continuously used the thoroughfare as frequently as it found convenient or necessary. Indeed, our supreme court followed this line of thought in *Boyer v. Clark*, 326 P.2d 107 (Utah 1958), reasoning that even though the public does not have to consist of "a great many persons," those members of the public must be able to access the road as frequently and conveniently as they wish to do so, *see id.* at 109; *see also AWINC*, 2005 UT App 168, ¶ 11.

¶51    Here, we find no error in the district court's conclusions. The public was prevented—by the Fautins themselves at times— from using the Road as a public thoroughfare by locked gates and by the understanding that permission was required to use it. *See Wasatch County v. Okelberry*, 2008 UT 10, ¶ 15, 179 P.3d 768 ("[A]n overt act intended to and reasonably calculated to interrupt use of a road as a public thoroughfare . . . simply precludes a finding of continuous use."); *see also Campbell v. Box Elder County*, 962 P.2d

806, 809 (Utah Ct. App. 1998) (concluding that permissive use with devices such as locked gates precludes "dedication as a public thoroughfare"). So, while some "members of the public" (namely, the Fautin cohort) used the Road, they did not use it as a public thoroughfare. Here, the district court found that certain "members of the public" had prevented the rest of "the public" from using the Road as frequently as the public found convenient or necessary. As the district court's unchallenged findings establish, the Fautins actively prevented the Road from being used as a public thoroughfare by blocking the public's access to use the Road when members of the public wanted to use it. Accordingly, the district court did not err by concluding that the use of the Road did not meet the statutory requirements for public dedication.

B.     Analysis of Public Use of the Road Prior to 1953

¶52     The Fautins relatedly argue that the district court failed to analyze the "open and free use" of the Road prior to 1953 and, consequently, that the court clearly erred when it concluded that there was not clear and convincing evidence of use.[7] The reason that this analysis matters, the Fautins argue, is that it provided unequivocal and uncontradicted support for their position that the "practical character" of the Road has not changed "since at least 1910." In contrast, S&W argues that the district court's findings regarding the pre-1953 existence and nature of the Road were not clearly erroneous because extensive evidence was presented at trial to support the court's findings: "The parties and

---

7. On this aspect of the issue, the Fautins state that they "challenge . . . the [district] court's finding[] . . . that the Fautins produced no clear and convincing evidence of the existence of the [Road] prior to 1953." Even given this assertion, the Fautins still do not challenge the factual finding but instead challenge the court's weighing of the evidence presented on the historical use of the Road.

the [district] court examined map-after-map and photo-after-photo ad nauseam during the trial with fact witnesses, expert witnesses and closing arguments. The old maps and photos were unclear until 1953. Testimony from the witnesses was unclear. Even the Fautins' expert couched his opinions as what he felt was 'likely' as opposed to clear and convincing and made various assumptions to get from point to point."

¶53    We agree with S&W. The district court devoted substantial time to reviewing the historical use and route of the Road. It looked at the 1897 map, the 1910 map, the 1937 map, the 1943 photograph, and other evidence, including extensive expert testimony. The court simply did not find the evidence the Fautins presented persuasive in showing that the Road existed and was used by the public for at least ten years in its present condition prior to 1953.

¶54    The Fautins argue that the district court should have been swayed by what they characterize as "clear and convincing evidence" about the pre-1953 condition of the Road. But the court was not convinced. And in our view, the court did not abuse its discretion in so viewing the evidence. "The mere fact that we might have reached a different result when looking at the same evidence will not justify setting the findings aside." *State v. Goddard*, 2021 UT App 124, ¶ 12, 501 P.3d 1188 (cleaned up), *cert. denied*, 505 P.3d 55 (Utah 2022). And here, the evidence was, at best, disputed and unclear as to the existence and route of the Road before 1953.

¶55    Moreover, even if the Road existed in its present state before 1953, the Fautins did not present convincing evidence that the Road was open to public use or that the public in fact used it for a ten-year period. On the contrary, there was evidence of gates and barriers. In other words, even if the Road did exist in its present route before 1953, the Fautins presented scant evidence—apart from speculation—that the public (as opposed to private

mining operations) used the Road in those early days. In the absence of contrary evidence, the court would have been left to speculate about the public's use of the Road during the mining days.

¶56   In sum, we see no error in the court's conclusion that the Fautins failed to meet their burden of proof on their dedication counterclaim, either as it concerned the Fautins' use of the Road or the use of the Road before 1953.

## II. Prescriptive Easement

¶57   The Fautins next argue that the district court erred when it determined that they did not have the adverse mental state necessary to support a prescriptive easement. *See Van Denburgh v. Sweeney Land Co.*, 2013 UT App 265, ¶ 3, 315 P.3d 1058 ("To establish a prescriptive easement, a party must show, by clear and convincing evidence, that its use of the area in question has been (1) open, (2) notorious, (3) adverse, and (4) continuous for at least 20 years. Once a claimant has shown an open and continuous use of the land . . . , the use will be presumed to have been adverse. The burden then shifts to the landowner opposing the easement to establish that the use was initially permissive." (cleaned up)).

¶58   The thrust of the Fautins' argument is that the Fautins must have possessed an adverse mental state when using the Road because (1) the Magnuses never gave permission to the Fautins to use the Road and (2) the Fautins didn't seem to care who owned the Road. The Fautins argue that the district court should have looked at these two facts and concluded that the Fautins would have used the Road in any case: "The fact that the Fautins blew through the gates when they did not have keys, believed they had rights to use the road independent of what the landowner said or did not say, and did not know or care who actually owned the road, shows disregard for, not submission to, the will and rights of the landowner, despite any lack of controversy." In other words, the Fautins argue that the district court erred when it said

there were no acts "meant to controvert" the owner. Instead, the Fautins assert that the court should have construed the evidence to conclude that the Fautins never submitted to the landowner in their use of the Road. *See Harrison v. SPAH Family Ltd.*, 2020 UT 22, ¶ 31, 466 P.3d 107 ("[I]t is the prescriptive user's submission to the landowner that interrupts the prescriptive period—not the owner's grant of permission."). Since, in the Fautins' view, there was no evidence of submission, the Fautins argue that the court should have found an adverse mental state sufficient to support a prescriptive easement.

¶59    "In Utah, a prescriptive easement is established where the use of another's land was open, continuous, and adverse under a claim of right for a period of twenty years." *Id.* ¶ 28 (cleaned up). Our supreme court has further explained that "there are two aspects to the requirement that a prescriptive use be continued for the prescriptive period: one mental, the other physical." *Id.* ¶ 29 (cleaned up). The physical aspect of continuous use—about which there is no dispute here insofar as it concerns the Fautins' prescriptive easement claim—"requires that the prescriptive user actually and continually use the easement throughout the prescriptive period." *Id.* On the other hand, "the mental aspect requires that the prescriptive user remain in an adverse posture to the holder of the servient estate throughout the prescriptive period. So where the user submits to the title of the possessor, or abandons the adverse claim under which the use is made, there is a break in the continuity of adverse use." *Id.* (cleaned up). And "a landowner's grant of permission to the prescriptive user will not work an interruption unless the user submits to the title of the landowner by accepting the license offered. So it is the prescriptive user's submission to the landowner that interrupts the prescriptive period—not the owner's grant of permission." *Id.* ¶ 31 (cleaned up). Citing this articulation, the Fautins argue that they had an adverse posture because they never submitted to the landowner.

¶60 We are unpersuaded by the Fautins' argument that the district court erred in interpreting and applying *Harrison v. SPAH Family Ltd.*, 2020 UT 22, 466 P.3d 107. "[W]here there is contradictory testimony regarding whether a prescriptive user accepted a landowner's permission, the fact finder should weigh the credibility of the witnesses in determining whether an interruption in the prescriptive user's adverse mental state occurred." *Id.* ¶ 32. And "where it is unclear whether a prescriptive user accepted the landowner's permission, but the user acted in a way that would lead a reasonable person to believe that the user had so accepted, this fact should lead the fact finder to conclude that a mental interruption of the prescriptive period occurred." *Id.*

¶61 Here, there was extensive evidence that the Fautins never had the sort of adverse mental state necessary to support a prescriptive easement in gross. To the contrary, the evidence shows that the Fautins continued to submit to the Property owner by actively reaching out for keys and seeking the permission from the owner or the agent of the owner (namely, DeLuke or Peterson) to use the Property. "The pill that is hard for many appellants to swallow is that if there is evidence supporting a finding, absent a legal problem—a fatal flaw—with that evidence, the finding will stand, even though there is ample record evidence that would have supported contrary findings." *Kimball v. Kimball*, 2009 UT App 233, ¶ 20 n.5, 217 P.3d 733 (cleaned up). This is the case here. It's true that the Fautins have presented evidence that could be construed in their favor—that they had an adverse mental state. But it's equally true that there is plenty of evidence cutting in the other direction—that they sought permission and "submit[ted] to the title of the landowner by accepting" that permission—to use the Road. *See Harrison*, 2020 UT 22, ¶ 31 (cleaned up).

¶62 It is irrelevant whether the Fautins knew precisely who owned the Road. The fact remains that the Fautins sought and accepted permission to use the Road from the presumptive owner

or that owner's agent. And this fact—fulsomely supported by the record—defeats their claim that their use of the Road was adverse because it belies their contention of non-submission. Accordingly, we perceive no error in the district court's conclusion that the Fautins did not possess a prescriptive easement for lack of an adverse mental state.

CONCLUSION

¶63 The Fautins' claim that the district court incorrectly interpreted and applied the Dedication Statute fails because the court's determination that there was no public use for the statutory period was supported by the evidence. The district court's determination that no prescriptive easement existed was correct because it was supported by unchallenged findings supporting the conclusion that the Fautins did not possess an adverse mental state.

¶64 Affirmed.

————————