IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JERRY LEE BROCK, | No. 86617-6-I |
| Appellant, | DIVISION ONE |
| v. | |
| STATE OF WASHINGTON, | PUBLISHED OPINION |
| Respondent. | |

SMITH, C.J. — In July 2013, the Washington Legislature enacted the wrongly convicted persons act (WCPA), chapter 4.100 RCW, in an attempt to remedy the unique harm suffered by wrongly convicted persons. It recognized that those who have been wrongly convicted not only lose years of their lives, but also have lost opportunities and experiences impossible to recover after their release from imprisonment. Then, upon their release, they suffer further by the stigmatization of being labeled a felon. So, the legislature provided an avenue for them to seek compensation after their exoneration. To receive such compensation, the claimant must establish actual innocence by clear and convincing evidence.

In 1995, Jerry Brock was convicted of child molestation in the first degree and sentenced to life without parole. In 2012, Brock's victim recanted her allegations against him, stating that she lied and Brock never touched her.

In 2013, Brock initiated a personal restraint petition seeking a new trial. The trial court found that the recantation was credible, vacated the conviction, and ordered a new trial. The State moved to dismiss the case, which was granted. Brock then initiated a claim under the WCPA, seeking compensation. That case proceeded to trial in 2022 and Brock's claim was ultimately denied. Brock appeals, asserting the trial court erred in determining that he did not show actual innocence by clear and convincing evidence, in failing to give due consideration to the difficulties of proof not caused by Brock, and in imposing an impossible legal burden contrary to the purpose of the WCPA.

We disagree and affirm.

FACTS

Background

In July 1995, a jury convicted Jerry Brock of child molestation in the first degree for sexually assaulting 11-year-old R.R.

Four months earlier, Brock, an old family friend, had reconnected with R.R.'s mother, Charlene Rush, by happenstance in Olympia. After learning that Brock was staying at the local Salvation Army shelter, Rush invited Brock and his fiancée over for dinner with her boyfriend, Tony Fair, and three daughters. Brock arrived the next day, without his fiancée. He interacted with all three girls throughout the night, playing cards, dancing, and allowing one to braid his hair. As the evening progressed, Rush and Fair decided to allow Brock to sleep on the couch because it was against the shelter's policy to admit anyone after 9:00 p.m.

2

or anyone who had been drinking. The apartment was a one-bedroom, and Rush and Fair took the bedroom while the three girls slept on the floor in the living room. R.R. slept the closest to Brock.

Around 1:00 a.m. in the morning, Brock woke Fair and Rush to ask to pass through their bedroom to use the restroom. Shortly after Brock exited the bedroom, Fair heard another knock. At trial, Fair testified that he heard a "very, very agitated knock" and found R.R. at the door. He testified that R.R. told him that Brock had "touched her, put his hands in her pants," and then left. Fair and R.R. then woke Rush and repeated the story. When Fair and Rush went to look for Brock, he had already left the apartment.

Fair and Rush called the police and Officer Gregory Brown arrived quickly. Officer Brown interviewed R.R., who relayed that she had been sleeping on the floor when she woke to Brock touching her. She stated "I was laying down on my bed and I woke up and he, my pants were down and my underpants were down and his hands was in my pants. . . then he took off, he got on his clothes and he left." R.R. clarified that Brock had touched her vagina. Officer Brown then drove Fair, Rush, and R.R. to St. Peter Hospital for a sexual assault examination. R.R. recounted the incident to the sexual assault nurse examiner. The exam did not provide evidence of sexual assault.

Brock was arrested at the Salvation Army shelter around 2:00 a.m. and taken into custody. Detective Michael Hovda, the Olympia Police Department's investigator for child and sexual abuse, interviewed Brock a few hours later.

3

Brock told Detective Hovda that he had spent the evening at the apartment, slept on the couch, and left early because he felt he was making one of the girls uncomfortable. He initially denied touching R.R. at all. When Detective Hovda asked if R.R. could have misunderstood Brock's actions in some way, Brock agreed that it was possible because, while lying on the couch, his arm may have fallen off the edge and bumped into her. He later stated, "all right. I'll tell you the truth. I had three beers. She's a fast girl. She kept looking at me." He continued on to say he had touched R.R.'s face and back, but repeatedly denied touching her vagina.

About a month after the incident, Detective Hovda interviewed R.R. R.R. reiterated that Brock stayed at the apartment, that he slept on the couch while the three girls slept on the floor, and that she awoke to Brock touching her vagina. She also stated that Brock had told her "I'm through with you" and "don't tell the cops cause [sic] I'll go back to prison." R.R. testified to a similar effect at trial, adjusting her statement slightly based on evidence deemed inadmissible.

R.R., Fair, Rush, Officer Brown, and Detective Hovda all testified at trial. The jury convicted Brock of child molestation in the first degree and, because this was his "third strike" under the Persistent Offender Accountability Act of the Sentencing Reform Act of 1981, chapter 9.94A RCW, Brock was sentenced to life in prison without the possibility of parole. His conviction and sentence were affirmed on appeal.

4

Recantation and Reference Hearing

In 2012, R.R. recanted her 1995 allegations against Brock. She decided to recant after learning from her mother that Brock was still in prison. She attributed lying in the first place to her desire for her mother's attention. Prior to coming forward, R.R. worked with a private investigator and eventually signed a six-page declaration stating that Brock "never did anything to [R.R.] that was inappropriate." The declaration further explained that she had a friend at the time who had gone through a similar experience. Noting that this friend received more attention from her mother in the aftermath, R.R. stated that she "took [her friend's] story and made it [her] own."

In June 2013, Brock initiated his third personal restraint petition, now seeking a new trial based on R.R.'s recantation declaration. That November, Thurston County Superior Court held a reference hearing to determine if Brock was entitled to a new trial.

R.R. testified that she lied about the assault to gain attention from her mother. She provided an in-depth account of her childhood and her mother's absentee parenting, but when she was asked about the specifics of the incident, speaking to law enforcement, and her earlier testimony, she responded with "I don't recall." She did note that she blamed Brock for her mother's choice to return to drug use.

Evaluating R.R.'s recantation against her initial trial testimony, Detective Hovda's testimony, and other evidence from the 1995 trial, the court found R.R.'s

recantation to be credible and reliable by a preponderance of the evidence. The court noted that her desire to recant "was not motivated by anything other than her stated desire to tell the truth." Accordingly, the court found that the recantation was new evidence warranting a new trial. The court vacated Brock's conviction in November 2014. In December 2014, the court dismissed the case without prejudice on a motion from the Thurston County Prosecuting Attorney's Office.

<u>WCPA Claim and Trial</u>

Brock subsequently initiated a claim under the WCPA, which proceeded to trial in November 2022. To prevail, Brock had to show, by clear and convincing evidence, that he met all six elements of the WCPA. The State stipulated to five of the six elements, leaving whether Brock "did not engage in any illegal conduct alleged in the charging documents" as the only issue in dispute. RCW 4.100.060(1)(d). This required Brock to prove actual innocence. RCW 4.100.020(2)(a).

Leading up to trial, the court deemed R.R. unavailable to testify after her attorney moved to quash the subpoena, citing undisclosed physical and emotional health issues, and stating that R.R. would invoke her Fifth Amendment[1] right not to incriminate herself in court. The court instead admitted her 2014 testimony and the post-conviction order granting Brock a new trial. At trial, Brock provided three witnesses, his attorneys from the reference hearing

---

[1] U.S. CONST. amend. V.

and their investigator, who all reiterated R.R.'s reason for recanting and vouched for her truthfulness. All three recounted that, when they spoke to R.R., her recantation stayed consistent and she did not deviate from her answers.

Brock also testified, maintaining that he was innocent and unequivocally denying that he had ever molested R.R. He further testified about his recollections from the initial incident, detailing his experience of the night. But when asked about his interrogation with Detective Hovda, Brock stated that he could not remember the details of his answers, including his statement that R.R. was a "fast girl" and that he had touched her face and back. He maintained that he had never confessed to molesting a child.

The State admitted the transcripts and evidence from the 1995 criminal trial, as well as the statements R.R. made to the sexual assault nurse into evidence. The State also called Officer Brown as a witness. He testified, largely through refreshing his recollection with his 1995 report and recorded statements, and reiterated his 1995 testimony.

The court found both the original allegations and the recantation to be credible and internally consistent. Accordingly, the case turned on the remaining evidence, including Brock's testimony. The court found some elements of Brock's testimony to be credible, but other pieces to be unreliable. Finding that the totality of the evidence more strongly supported the original inculpatory trial testimony than the recantation, the court ruled that Brock did not carry his burden

of proving clearly and convincingly that he was actually innocent.  The court denied Brock's WCPA claim.

Brock appeals.

ANALYSIS

Standard of Review

The parties dispute the appropriate standard of review.  Brock asserts that we review the trial court's order denying his WCPA claim de novo.  The State disagrees, maintaining that we review the order primarily for substantial evidence.  Because the trial court acted as a fact-finder, we review the findings of fact for substantial evidence.  We review de novo whether the trial court's findings of fact support its conclusions of law.  We similarly review de novo the trial court's interpretation and application of the law.

RCW 4.100.050 provides that, in the case of dismissal of a WCPA claim, we review the superior court action de novo.  A court may dismiss a WCPA claim if it finds that the claimant does not meet the filing criteria set forth under RCW 4.100.040.  RCW 4.100.040(6)(a).  But RCW 4.100.040 only requires that a claim be actionable.  *Apolo-Albino v. State*, 27 Wn. App. 2d 566, 571, 533 P.3d 435 (2023).  "That a claim be 'actionable' is a lower threshold than certainty that a claim will succeed."  *Apolo-Albino*, 27 Wn. App. 2d at 571.  This burden of production, unlike the ultimate burden of persuasion, is generally determined as a matter of law.  *Apolo-Albino*, 27 Wn. App. 2d at 571.

8

If a trial court dismisses a case as a matter of law, we review the dismissal de novo and ask whether the plaintiff presented a prima facie case. *In re Dependency of Schermer*, 161 Wn.2d 927, 939-40, 169 P.3d 452 (2007). "But if the trial court acts as a fact-finder, appellate review is limited to whether substantial evidence supports the trial court's findings and whether the findings support its conclusions of law." *Schermer*, 161 Wn.2d at 940.

Substantial evidence is "evidence sufficient to persuade a fair-minded, rational person of the finding's truth." *State v. Pratt*, 11 Wn. App. 2d 450, 457, 454 P.3d 875 (2019). "If substantial evidence supports the findings, a reviewing court will not substitute its judgment for that of the trial court even though it might have resolved a dispute of fact differently." *City of Seattle v. Wiggins*, 23 Wn. App. 2d 401, 407, 515 P.3d 1029 (2022). We defer to the trier of fact to resolve conflicting testimony or evaluate the persuasiveness of evidence and credibility of witnesses. *Thompson v. Hanson*, 142 Wn. App. 53, 60, 174 P.3d 120 (2007). We review whether the trial court's findings of fact support its conclusions of law de novo. *State v. Roberts*, __ Wn. App. __, 553 P.3d 1122, 1134 (2024).

Here, the trial court did not dismiss Brock's claim as a matter of law. Rather, the court determined that his claim was actionable and then acted as a fact-finder in determining whether he succeeded on the merits. Accordingly, we review the trial court's findings of fact for substantial evidence. We review de novo whether the trial court's findings of fact support its conclusions of law as well as the trial court's interpretations and applications of law.

9

Wrongly Convicted Persons Act

The WCPA creates a civil avenue for wrongly convicted persons to petition the State for financial benefits meant as redress for the unique injustice of being incarcerated for a crime they did not commit. RCW 4.100.010. A person is wrongly convicted if "he or she was charged, convicted, and imprisoned for one or more felonies of which he or she is actually innocent." RCW 4.100.020(2)(b).

To prevail on a WCPA claim, the claimant must show, by clear and convincing evidence, that:

> (a) [t]he claimant was convicted of one or more felonies in superior court and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;
>
> (b)(i) [t]he claimant is not currently incarcerated for any offense; and
>
> (ii) [d]uring the period of confinement for which the claimant is seeking compensation, the claimant was not serving a term of imprisonment or a concurrent sentence for any conviction other than those that are the basis for the claim;
>
> . . .
>
> (c)(ii) [t]he claimant's judgment of conviction was reversed or vacated and the charging document dismissed on the basis of significant new exculpatory information . . .
>
> (d) [t]he claimant did not engage in any illegal conduct alleged in the charging documents; and
>
> (e) [t]he claimant did not commit or suborn perjury, or fabricate evidence to cause or bring about his or her conviction.

RCW 4.100.060(1)(a)-(b)(ii), (c)(ii)-(e).

Clear and convincing evidence exists when " 'the ultimate fact in issue is shown by the evidence to be highly probable.' " *In re Dependency of A.N.C.*, 24

Wn. App. 2d 408, 414, 520 P.3d 500 (2022), *review denied*, 1 Wn.3d 1012 (2023) (internal quotation marks omitted) (quoting *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995)).

### 1. Actual Innocence

Brock asserts that the trial court erred in holding that he did not prove actual innocence by clear and convincing evidence because R.R.'s testimony alone satisfies his burden. He further contends that, when combined, R.R.'s 2012 recantation, her 2014 testimony, his 2022 witnesses, and his own testimony far exceed his burden of proof.[2] The State disagrees, maintaining that the court properly exercised its role as factfinder and, in weighing the evidence, found Brock's evidence to be unpersuasive. We agree with the State.

A person is actually innocent under the WCPA if "he or she did not engage in any illegal conduct alleged in the charging documents." RCW 4.100.020(2)(a).

Brock's argument centers on the idea that his evidence *should* have been enough to persuade the trial court that he did not engage in any of the alleged illegal conduct. But that is not the applicable question. Rather, we consider

---

[2] The Washington Innocence Project (WIP) submitted an amicus brief in support of Brock's claim that R.R.'s recantation is sufficient to establish actual innocence by clear and convincing evidence. Documenting the legislative history of the statute, WIP emphasized its remedial nature and reiterated Brock's concern that affirming the trial court's decision constitutes a wholesale rejection of all recantation evidence. In response to the amicus brief, the State moved to strike factual allegations in the brief with no authority or citation to the record. Because WIP makes assertions of fact without a citation to the record or authority, in violation of RAP 10.3(a)(5), (6) and RAP 10.3(e), we do not consider these specific allegations.

whether the trial court's ultimate findings were supported by substantial evidence. We conclude that they were.

The trial court was presented with two narratives of the incident: R.R.'s contemporaneous allegations and her 2012 recantation. Finding both to be credible and internally consistent, the court concluded as a matter of law that R.R.'s recantation did not supersede or eliminate R.R.'s allegations. Instead, R.R.'s recantation simply provided a competing version of events. Faced with these competing accounts, the court then considered the totality of the evidence presented. And while this included Brock's bolstering of R.R.'s recantation and his consistent declarations of innocence, it also included how Brock left Rush's apartment in the early morning hours despite knowing he would likely not have a bed at his shelter, how R.R. somehow knew that he would "go back to prison" if she told the police what happened, and how Brock himself admitted to touching R.R.'s face and back and labeled her a "fast girl."

The court also assessed Brock's credibility. And although the court found it credible that Brock was still intoxicated during his custodial interview and that he felt bullied by Detective Hovda, the court found it less credible that he could simultaneously have no memory of inculpatory aspects of the interview while remaining absolutely certain about exculpatory details.

Brock carries the high burden of proving that it is highly probable that he is actually innocent of the alleged wrongful conduct. Given the extent of the evidence the court considered, including Brock's incriminating behavior and

12

statements, knowledge R.R. had that an 11-year-old would not likely have been able to fabricate, and its finding that Brock's account was "less than completely plausible," the court had sufficient evidence to determine that he did not meet his burden.

Even if the court did not have evidence beyond the original allegations and the recantation, Brock would still have failed to meet his burden. The court found both accounts credible. Accordingly, Brock would not have been able to prove that it was highly probable that the recantation was the accurate representation of the incident.

We conclude that the trial court did not err in determining that Brock failed to prove actual innocence by clear and convincing evidence.

2. <u>Difficulties of Proof</u>

Brock next asserts that the trial court erred in failing to follow the WCPA's mandate to give due consideration to difficulties of proof not caused by the parties. Because the court specifically acknowledged that the statute provides a more forgiving evidentiary landscape, considered it in "loosen[ing] the rules of evidence," and allowed Brock to admit otherwise inadmissible hearsay and bolstering evidence, the trial court did not abuse its discretion in managing the difficulties of proof.

We review a trial court's decisions to admit and weigh evidence in a WCPA trial for an abuse of discretion. *Larson v. State*, 194 Wn. App. 722, 739, 375 P.3d 1096 (2016). A trial court abuses its discretion "when its decision is

13

manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *Larson*, 194 Wn. App. at 7739. A trial court does not abuse its discretion by enforcing the rules of evidence. *Larson*, 194 Wn. App. at 740.

RCW 4.100.060(3) requires the court, in its discretion, to give due consideration to difficulties of proof not caused by a party, including those caused by the passage of time or the death or unavailability of a witness. "If the court decides the difficulties of proof do not warrant admitting certain evidence, the court has discretion not to admit it." *Larson*, 194 Wn. App. at 740.

Here, Brock asserts that the trial court abused its discretion in failing to appreciate how Rush's death in 2017 deprived him of evidence, in finding that the 1995 allegations were "somewhat more" supported than R.R.'s recantation, and in criticizing Brock's current testimony about his original interrogation. We disagree.

First, the court did give due consideration to the difficulties that Rush's death caused Brock and adjusted the admission of evidence as a result. Recognizing that Rush could no longer testify, the court allowed Brock to admit both hearsay and bolstering evidence to show that Rush immediately believed R.R.'s recantation. Brock, his two attorneys, and his investigator all testified to that effect. Because the witnesses were able to testify that Rush believed the recantation and no contradictory testimony exists indicating that Rush did not believe it, the lack of her testimony at trial did not affect how the court viewed her

14

belief. Therefore, her death did not create a gap in the known evidence that would not have existed had she survived to testify.

Furthermore, there is no way to know what Rush's testimony would actually have been. Brock contends that Rush's testimony would have been "powerful evidence of [his] innocence" but does not provide any evidence of why her testimony would have provided anything more than what was presented to the court. Given that it was not possible for Rush to testify, the court allowed into evidence all the testimony that was available. The potential existence of evidence that may favor the claimant cannot be enough to establish that a trial court abused its discretion in failing to adequately counter difficulties of proof.

Next, Brock challenges the court's determination that the evidence supported R.R.'s 1995 allegations more fully than it supported her recantation. Brock again points to Rush, contending that the court ignored that her death impeded Brock from presenting evidence from the only witness, other than R.R., who was involved in every step of the process. But, as noted above, the court did grant Brock leeway when it came to managing the lack of Rush's testimony. And speculation as to what she might have said is not enough to establish an abuse of discretion.

Brock then contends that the trial court erred in believing R.R.'s 1995 allegations because "the evidence recounting the truth of Brock's innocence was of a more persuasive character than any of the statements about what a child claimed for a few months in 1995." But this argument centers on credibility that

is determined by the trier of fact and has little relevance to whether the court considered difficulties of proof. We defer to the trier of fact to evaluate the credibility of witnesses. The court considered R.R.'s original allegations, the corroborating evidence supporting those allegations, R.R.'s recantation, Brock's witnesses' testimony, and Brock's statements in 1995 as well as his own testimony at the hearing in determining credibility. And it was primarily Brock's most recent testimony, given after the court relaxed the rules of evidence, that convinced the court that he was not a reliable witness. This was not an abuse of discretion.

Finally, Brock asserts that the court failed to give due consideration to the passage of time when determining that Brock's testimony was not credible because it noted that he could not remember details of his original interrogation. But what the court noted was Brock's ability to remember exculpatory details with great clarity, while struggling to remember any inculpatory details at all. The court made a credibility determination based in large part on the self-serving nature of Brock's memory, as opposed to an actual failure of memory.

The purpose of the statutory provision is to prohibit the State from using difficulties of proof that are not the fault of the claimant against the claimant. The provision does not provide that such a claimant should be given an advantage based on those difficulties of proof. The trial court gave the appropriate consideration to the difficulties of proof and granted Brock evidentiary leeway to mitigate them. Ultimately, Brock failed to meet his burden, even given that

16

leeway. The trial court did not abuse its discretion in failing to grant Brock more latitude than it already had.

### 3. Legal Burden

Brock asserts that the trial court's reasoning that R.R.s' recantation does not necessarily negate her prior allegation imposes an impossible legal burden that contradicts the remedial purposes of the WCPA. The statute does not guarantee that any recantation constitutes clear and convincing evidence of innocence. Analysis under the WCPA is highly fact-specific. Because the court appropriately found that Brock did not meet his burden of proving actual innocence, we conclude that affirming the trial court's reasoning does not create a legal burden inconsistent with the language of the statute.

Brock contends that any complete recantation should automatically be proof of actual innocence by clear and convincing evidence. Otherwise, he suggests, an entire class of innocent people – "those subject to a false allegation truthfully recanted" – would be unable to obtain relief under the statute. But Brock conflates "truthful" and "credible." The trial court concluded that both R.R.'s recantation and her original allegations were credible. It specifically did not determine that one or the other was true. In fact, the court noted that the two narratives created "competing version[s] of events" that had to be reconciled by the surrounding evidence. Here, the court determined, largely based on Brock's own testimony, that the surrounding evidence more fully supported the veracity of R.R.'s original allegations. As a result, the court's findings would only preclude

claimants who cannot prove actual innocence by clear and convincing evidence based on the specific facts of the particular case – proof that the statute already requires for compensation.

Additionally, the statute itself does not guarantee that a recantation alone is enough to prove innocence by clear and convincing evidence. The statute only details the requirement. It provides no further description of what constitutes that clear and convincing evidence.

And finally, analysis under a wrongful conviction statute is highly fact-specific. Without explicit statutory language, Brock relies on a Utah Supreme Court case, *Ashby v. State*, 2023 UT 19, 535 P.3d 828, to support his claim that, in finding that R.R.'s recantation did not satisfy his burden, the trial court inflated his burden. And although *Ashby* is not binding law, given the dearth of Washington caselaw and the similarities between the statutes at issue, the case is a reasonable comparator. That said, *Ashby* is distinguishable.

In *Ashby*, under the Post-Conviction Remedies Act (PCRA), Part 4, Post-Conviction Determination of Factual Innocence statute, Caroline Ashby requested compensation for her wrongful conviction for aggravated sexual abuse of her son, K.A., following his recantation. 2023 UT 19, ¶ 2. Ashby's conviction was based solely on K.A.'s original testimony. *Ashby*, 2023 UT 19, ¶ 70. And K.A.'s testimony surrounding the alleged abuse varied dramatically while preparing for trial. *Ashby*, 2023 UT 19, ¶ 14. But when K.A. recanted, the trial court determined that Ashby still had not proved factual innocence, stating "it

would be difficult for [K.A.'s] testimony to provide clear and convincing evidence of Ashby's innocence." *Ashby*, 2023 UT 19, ¶ 53.

On review, the Utah Supreme Court reversed, specifically holding that "where a conviction rests entirely on the testimony of a single witness, a credible recantation by that witness, standing alone, is sufficient to prove factual innocence by clear and convincing evidence. To the extent that the district court considered it more difficult to prove factual innocence with a recantation than with other evidence, it inflated Ashby's burden of proof." *Ashby*, 2023 UT 19, ¶ 55. Brock points to *Ashby* as evidence that, in not accepting R.R.'s recantation as clear and convincing of actual innocence, the trial court did the same. But the *Ashby* court also noted, "to be sure, recantations must be carefully scrutinized. . . . Determining which story to credit requires a careful examination of the retracting witness's credibility under oath and the circumstances surrounding the recantation." 2023 UT 19, ¶ 60.

Brock's case is factually distinct from *Ashby*. R.R.'s testimony was not the sole basis of Brock's conviction and the trial court did not suggest that any recantation evidence would fail to overcome conflicting allegations.

In contrast to K.A.'s testimony, R.R.'s testimony was supported by various witnesses and other corroborating evidence: where K.A.'s father and stepmother testified they did not believe Ashby to have assaulted her son, Rush and Fair testified in support of R.R.; where K.A. changed his story dramatically, including on the stand, R.R. stayed consistent. And Brock himself spoke to his own

incriminating behavior, acknowledging in a statement to Detective Hovda that he did touch R.R., that she could have misinterpreted his behavior, and suggesting that she was a "fast girl."

Additionally, the trial court here never expressed that R.R.'s recantation was unreliable by nature of it being a recantation. Rather, the court simply found that the totality of the evidence supported guilt more than innocence. Given the factual distinction between the cases and the specificity of the Utah Supreme Court's holdings, *Ashby* would actually suggest that R.R.'s recantation, standing alone, is not enough to establish actual innocence by clear and convincing evidence and that the trial court did not impose a higher burden of proof. The trial court's reasoning did not raise the burden of proof beyond that provided by the statute.

<u>Directed Verdict</u>

Lastly, Brock requests that the court enter a directed verdict in his favor. Because we affirm, we deny his request for relief.

Smith, C.J.

WE CONCUR:

Birk, J.

Chung, J.